RICE-STIX DRY GOODS CO. v. SELF.—101 S. W. (2d) 132.

Western Section. September 30, 1935.

Petition for Certiorari denied by Supreme Court, January 16, 1937.

500

 Lowell W. Taylor, of Memphis, and Louis Kawin, of St. Louis, Mo., for plaintiff in error.

 Julian C. Wilson, Walter P. Armstrong, Luther H. Graves, and Thos. A. McEachern, Jr., all of Memphis, for defendant in error.

KETCHUM, J. In this case the plaintiff, Self, sued the defendant Rice-Stix Dry Goods Company, of St. Louis, for damages for personal injuries sustained in an automobile accident. The accident occurred near Hagan, Ga., on September 12, 1930. The plaintiff was at the time employed by the Crescent China Company, manufacturers of chinaware, of Alliance, Ohio, under an arrangement previously made between that company and the defendant; the plaintiff was accompanying one I. H. Oppenheim, a regular salesman of the defendant, on his itinerary in the state of Georgia, as a specialty salesman selling china manufactured by the Crescent China Company. The plaintiff and Oppenheim were riding in a new Chevrolet sedan owned by the defendant and operated by Oppenheim.

The declaration alleged that the plaintiff was an employee of the China Company, that under the arrangement referred to it was the duty of the defendant to furnish him his transportation; that he had no control or direction over the operation of said automobile; that he occupied the status of a passenger for hire in said automobile, and that under the common law of the state of Georgia, the defendant owed him the exercise of ordinary care in the operation of said automobile; but that the defendant's agent, Oppenheim, carelessly and negligently operated said automobile at a rapid rate of speed across the highway from the right side to the left and off the road entirely, and against a telephone post, and into a bank, causing it to turn over and injure the plaintiff; more specifically, it was alleged that Oppenheim went to sleep and lost control of the car and ran it off of the road and into the telephone post and into the bank, causing plaintiff serious injuries set out in the declaration.

The defendant filed pleas of "not guilty" and contributory negligence; and (3) that under the law of Georgia where two persons are engaged in a joint enterprise or venture for their common benefit, the negligence of one of such persons is imputable to the other, and will bar a recovery of such other in an action to recover for such negligence; and (4) that under the law of Georgia the failure of a guest riding in an automobile to exercise ordinary care for his own safety, if by the exercise of ordinary care he could have avoided the consequences of the defendant's negligence, will bar his recovery.

The plaintiff, for replication, joined issue on the defendant's third plea, and says that it is not the law of Georgia that where two

persons are engaged in a joint enterprise or venture for their common benefit, the negligence of one of such persons is imputable to the other, and will bar a recovery of the other in an action to recover because of the other's negligence; but that the law of such state is that there must be a joint right to control the vehicle in which said persons were traveling; and that in this case there was no such joint right of control, and no joint venture or enterprise of any kind. For replication to the fourth plea the plaintiff pleads section 4426 of the Civil Code of Georgia, which is as follows:

"*Diligence of plaintiff.* If the plaintiff by ordinary care could have avoided the consequences to himself caused by the defendant's negligence, he is not entitled to recover. But in other cases the defendant is not relieved, although the plaintiff may in some way have contributed to the injury sustained."

It was then averred in said replication that the plaintiff could not by the exercise of ordinary care have avoided the consequences to himself of the defendant's negligence, and therefore under the terms of said statute the defendant was not entitled to rely upon its plea of contributory negligence; and that as construed by the highest appellate courts of Georgia, under said statute the doctrine of comparative negligence prevailed, and that under this rule if the negligence of the plaintiff, even though proximately contributory, is less than that of the defendant, the plaintiff can recover; and the plaintiff denied that he was guilty of any contributory negligence; or, if he was guilty of any, it was less in degree than that of the defendant, and under the law of Georgia it did not bar his right to recover.

Under the issues raised by these pleadings the cause was heard before the court and a jury, and resulted in a verdict and judgment in favor of the plaintiff for $40,000. A motion for a new trial was seasonably filed, and on the hearing of this motion, the court "being of opinion that the verdict of the jury is excessive" suggested a remittitur of $15,000 as a condition to the denial of the motion for a new trial, and overruled all the other grounds of said motion. The plaintiff accepted this remittitur under protest, and judgment was then entered allowing said remittitur of $15,000, and entering judgment in favor of the plaintiff for $25,000. From this judgment both the parties have appealed in error to this court, the plaintiff appealing from so much thereof as reduced his judgment from $40,000 to $25,000.

The defendant has filed 25 assignments of error in this court; but the principal issues have been raised by the first assignment based upon the action of the court in overruling the defendant's motion for a directed verdict in its favor made at the close of all the proof. This was alleged to be error because

"(a) The undisputed proof showed that the plaintiff and I. H. Oppenheim were fellow servants of the defendant at the time of the accident—the undisputed proof being that the plaintiff had been lent to the defendant, and for the period in question had become and was its servant;

"(b) The undisputed proof showed that the defendant was guilty of no negligence and that the plaintiff's injuries were received as the result of unavoidable accident;

"(c) The plaintiff's testimony and all the proof showed that the plaintiff had acquiesced in the speed at which the car was running every day for two whole weeks, and it is not claimed that he protested at the speed at which the car was being driven at the time of the accident;

"(d) There is no evidence on which to base the verdict."

In the consideration of paragraph (a) of this assignment it will be assumed that Oppenheim was guilty of negligence in the operation of the automobile, and that his negligence will be imputed to the defendant, unless the plaintiff and Oppenheim were fellow servants. It is the contention of the defendant that although the plaintiff was regularly employed by the China Company, he was loaned to the defendant for the purposes of this trip.

The evidence on the subject is undisputed, and the material facts may be stated as follows:

The plaintiff was regularly employed by the Crescent China Company, manufacturers of china, as a salesman. Some time before this accident occurred an arrangement was made between the China Company and the Rice-Stix Dry Goods Company whereby the plaintiff should accompany the defendant's salesmen as a specialty salesman selling the China Company's goods. The orders for chinaware so sold by the plaintiff were taken through the defendant, who received a profit on the sales. The sales were made to the defendant's customers, and the defendant passed upon the credit of the customers and accepted or rejected the orders as it saw fit. If it accepted the orders the shipment was made from the Crescent China Company's factory to the Rice-Stix customer, and the goods were then charged by the China Company to the defendant until after the plaintiff had sold it and defendant had accepted the orders. The Crescent China Company paid the plaintiff a commission of 10 per cent. of the amount of the gross sales of chinaware so made as his compensation, and paid the Rice-Stix salesman a like commission. Under the arrangement made between the defendant and the China Company the defendant was to furnish the plaintiff his transportation. He selected his own hotels and the China Company paid his hotel bills and other traveling expenses.

The plaintiff had traveled with some ten or twelve of the defendant's salesmen under this arrangement, traveling from two to

three weeks with each one. During the month of August, the Rice-Stix salesmen were called in to St. Louis for the "market," when the merchants were accustomed to come to St. Louis to purchase their fall stocks. The defendant had samples of the China Company's ware on display in its building at that time, and the plaintiff was there to sell the China Company's goods under the same arrangement.

In September, 1930, the plaintiff accompanied the defendant's salesman, I. H. Oppenheim, on his itinerary in the state of Georgia. They traveled in a new Chevrolet sedan owned by the defendant and operated by Oppenheim. They carried their samples and their personal baggage on the back seat. The plaintiff's samples belonged to the Crescent China Company, and weighed about 50 pounds. Oppenheim's samples belonged to the defendant. Oppenheim determined the territory to be covered and the merchants to be solicited.

Under these facts the plaintiff was not a fellow servant of Oppenheim. He was working in the interest of the China Company selling its goods, and was paid by it for his services. In La Rose v. Donnelly, 219 App. Div., 181, 219 N. Y. S., 148, 151, the rule is stated as follows:

"The rule now is that as long as the employee is furthering the business of his general employer . . . there will be no inference of a new relation unless command has been surrendered, and no inference of its surrender from the mere fact of its division," citing Charles v. Barrett, 233 N. Y., 127, 219, 135 N. E., 199, 200.

The facts in this case were that Donnelly owned a stoneyard. Joseph Mahon furnished a truck and driver to deliver curbstone from this yard, for which Donnelly paid him $30 per day. One Miller ordinarily drove the truck. On the day in question Miller was called to court, and upon being advised of this fact Mahon took Mosley, the decedent, to Donnelly's yard and Mosley went to work on the truck in Miller's place, taking his directions from Donnelly and his foreman. He had driven away with one load, and was back, engaged in placing stone on the truck, when the derrick used for loading the stone fell and killed him. Mahon subsequently received $30 for the use of the truck and driver that day. In an action against Donnelly for his wrongful death, the defense was made that he was a loaned servant and that his remedy was under the Workmen's Compensation Act (Code 1932, section 6851 et seq.). The court, in holding that he was not a loaned servant, after stating the rule as above set out, said:

"The fact that Donnelly gave directions about the details of the work, and in a sense controlled his acts, does not of necessity change the relation that Mosley bore to Mahon who had the right

to give him general orders. [Citing cases.] Nor did the fact that Mosley stood on the truck and assisted somewhat in placing the stone and performing the incidental duties that arose in the course of the employment change the character of his relation to the parties engaged in the work. [Citing cases.]''

In Moss v. Chronicle Publishing Co., 201 Cal. 610, 258 P. 88, 89, 55 A. L. R., 1258, the court state the rule as follows:

''It is a well-recognized principle that, where the servants of two parties are jointly engaged in a work of mutual interest [to the parties], each employee is the servant of his own master and neither of the employees is the servant of the other's master. This principle has been stated as follows:

'' 'Servants of separate masters, although engaged in a common undertaking, are not fellow servants. To constitute that relation servants must be in the employ of, or controlled by, a common master. . . .' 39 Corpus Juris, section 668, pp. 557, 558. . . .

''Again, quoting from 39 Corpus Juris, section 1462, p. 1275: 'To escape liability, the original master must resign full control of the servant for the time being, it not being sufficient that the servant is partially under the control of a third person; and it is necessary to distinguish between authoritative direction and control and mere suggestions as to details or the necessary co-operation where the work furnished is part of a larger operation.' ''

The court in this case cited and quoted at length from the opinion in Chamberlain v. Lee, 148 Tenn., 637, 257 S. W., 415, 417. The facts in that case were that the defendants were the owners of an office building in the city of Chattanooga. The signal system in the elevator got out of order and defendants employed a firm of electrical contractors to remedy the trouble. The plaintiff was an employee of the contractors sent to make the repairs, and while engaged in this work was seriously injured as the result of the negligence of the elevator attendant. Upon reaching the building the plaintiff inquired of the janitor about the repairs to be made. This janitor, who had control of the building, explained the trouble, and directed the elevator boy to operate the cage up and down as directed by the plaintiff. The plaintiff rode up and down on the top of the cage, looking for the trouble but did not find it. He got off of the top of the cage at the second floor and walked down the stairway to the basement. He instructed the elevator boy to hold the cage where it was while he was at work underneath the cage. The elevator boy, in violation of his instructions, started the cage up toward the top of the building. This let the counterweights down upon the plaintiff, inflicting upon him serious injuries.

The chief contention of the defendants was that the plaintiff was the employee of an independent contractor; that at the time of

the accident the elevator boy occupied the position of a servant loaned to the independent contractor, and under the control of the plaintiff, and that, therefore, the plaintiff received his injuries at the hands of his fellow servant, and a servant of the contractor, and that defendants were accordingly not liable. The court say:

"This does not make out a case of lending a servant. The servant was put under the control of plaintiff for one purpose alone. That is, to move the car up and down as plaintiff desired while the particular job was being done. The elevator car was put under the control of the plaintiff for the time, but it was put under his control along with its attendant, who remained in the service of the defendants. There is nothing to show that plaintiff could have discharged this boy, and put another boy to running the elevator at this time. Plaintiff certainly had no right to use this elevator boy for any purpose in connection with the work other than running the elevator up and down. The plaintiff could not have required the elevator boy to remain on duty for a longer period than his regular hours under his contract with defendants.

"In order to escape responsibility for the negligence of his servant on the theory that the servant has been loaned, the original master must resign full control of the servant for the time being. It is not sufficient that the servant is partially under the control of a third person. 26 Cyc., 1522; 18 R. C. L., 784. The control of this servant was but partially transferred by defendants, with no right on the part of the plaintiff to discharge the elevator boy, or to use his services generally in connection with the job. This case is therefore not within the authority of Sanford v. Keef, 140 Tenn., 368, 204 S. W., 1154."

In Sanford v. Keef, the material facts were that Sanford purchased a gin from the Gullett Gin Company to be erected on his plantation in Arkansas. Under the contract the title to the gin passed to Sanford on delivery thereof f. o. b. cars at the point of shipment. The contract provided that Sanford would install and operate the gin in accordance with plans furnished by the Gin Company, and if this was done the Gin Company warranted that the gin would perform what was claimed for it in the printed circulars; and if the Gin Company furnished a man to superintend the erection of it, Sanford would pay him at the rate of $5 per day and expenses. Under this arrangement, Keef, who was a skilled man regularly in the employ of the Gin Company, was furnished as the erector, and when the work was almost finished he was injured while in the act of planing off a board near the breast of the gin's saws; he had previously given express direction that the engine should not be started, but the engineer provided by Sanford, to whom this direction was given, negligently started the engine and caused the saws to revolve, catching Keef as they did so, and inflicting upon him serious injuries.

Under these facts it was held that Keef was a loaned servant because under the terms of the contract the title to the gin had passed to Sanford, and it was explicitly provided that he should erect it. Plans were furnished for this purpose, but he had the right to use them or not, as he pleased. He elected to adopt the plans, and called for an erector as he had the right to do under the contract, and it was held that when Keef arrived at the plantation and began work he engaged in a transaction which was the business of Sanford, and that he could not be the servant of the Gin Company while working on a job that was not its, but Sanford's. And in holding that he was in this instance a loaned servant, the court say:

"The true test is whether in the particular service which he is engaged in performing at the time he continues liable to the direction and control of the general master or becomes subject to that of the person to whom he is lent or hired."

As authority for this statement of the rule the court cites the case of Powell v. Construction Company, 88 Tenn., 692, 13 S. W., 691, 693, 17 Am. St. Rep., 925, which is the earliest case on the question in this state to which our attention has been directed. In that case the rule is stated in the language of Mr. Justice Lurton as follows:

"The better test would seem to be, was he [the servant], in regard to the particular manner in which he was employed, doing the work of his general master; or was he engaged in doing the work of another, over whom the general master had no control? If he was performing a special service for another, who, with reference to the details of such work, was an independent contractor, then the servant will, as to that particular service, be the servant of the one for whom such service was performed, although he may be the general servant of another."

One of the leading cases on the subject is Standard Oil Company v. Anderson, 212 U. S., 215, 29 S. Ct., 252, 254, 53 L. Ed., 480. In that case it is said:

"To determine whether a given case falls within the one class or the other we must inquire whose is the work being performed,—a question which is usually answered by ascertaining who has the power to control and direct the servants in the performance of their work. Here we must carefully distinguish between authoritative direction and control, and mere suggestion as to details or the necessary co-operation, where the work furnished is part of a larger operation."

And quoting from the opinion of Chief Justice Holmes of the supreme judicial court of Massachusetts in the case of Driscoll v. Towle, 181 Mass., 416, 63 N. E., 922, it is further said:

"But the mere fact that a servant is sent to do work pointed out to him by a person who has made a bargain with his mas-

ter does not make him that person's servant. More than that is necessary to take him out of the relation established by the only contract which he has made and to make him a voluntary subject of a new sovereign,—as the master sometimes was called in the old books.''

It will be seen from the cases cited that it is well settled that in order to constitute one a loaned servant, the original master must have surrendered all direction and control, and the servant must be engaged entirely in the work of the new master. Measured by this standard, Self was not a loaned servant. He was selling the goods of the China Company, was working under its direction, and was paid by it. His orders from the China Company were to travel with the salesman of the Rice-Stix Company, and to sell to their customers, and in doing this he necessarily had to adapt himself to the schedules of the Rice-Stix salesmen in covering their territory. But this was not putting himself under the exclusive control and direction of the defendant. As a matter of fact, he received no orders from the defendant, and in the defendant's letter to its salesmen with reference to the plan by which the plaintiff should travel with them as a specialty salesman, he is referred to as the ''factory representative.''

The court did not err in denying the defendant's motion for a directed verdict upon the ground of the matter set out in paragraph (a) of the first assignment of error.

Paragraphs (b), (c), and (d) of the first assignment of error are based upon the ground that the defendant was guilty of no actionable negligence, and therefore the defendant's motion for a directed verdict should have been granted. Paragraph (b) is based upon the ground that the undisputed proof showed that the accident was unavoidable; paragraph (c), that the plaintiff acquiesced in the speed at which Oppenheim operated the car; and paragraph (d) that there was no evidence to sustain the verdict. These three grounds all relate to the question of Oppenheim's negligence, and will therefore be treated together. The facts necessary to be stated with reference to these grounds are as follows:

The automobile was practically new and was in perfect condition; the road was a sand-clay road, approximately 30 feet wide, perfectly smooth and straight; there was no traffic or other obstruction of any kind. It was a bright sunshiny day, at about 4 o'clock in the afternoon. There were three men in the car, all occupying the front seat. Oppenheim was driving, a Mr. New sat in the middle, and the plaintiff on the right side. Mr. New was the father of a customer of Oppenheim's at Vidalia, and was a guest of Oppenheim's in the car. The back part of the car was filled with the sample cases and baggage.

Oppenheim and plaintiff had driven about 100 miles or more in the forenoon calling on customers. They returned to Vidalia at

about 1 o'clock, where they had dinner. Oppenheim says he ate "a pretty heavy meal." This was impressed upon his mind by a statement that he made to Mr. Self at the time. They left Vidalia at about 3 o'clock to drive to Savannah, a distance of about 90 miles. They had driven about 35 or 40 miles to a point about 2 miles west of Hagan when the accident happened. Oppenheim's statement as to how the accident happened is as follows:

"Q. Will you state in your own way, and in your own words, just what occurred at that time and place?

"A. Well, as near as I can remember, the only thing I know, I was coming from Vidalia to Savannah. It was about four o'clock in the afternoon. It was a pretty hot day, and I was driving pretty fast, I guess between 40 and 50 miles an hour, and I must have closed my eyes for the moment, and the next thing I remember I hit a post, and was laying on the ground covered in dirt. . . .

"Q. State whether or not you have dozed previous to the accident en route from Vidalia, and before this accident, as you drove, the second or two preceding the accident?

"A. I felt myself slipping, and the next moment I knew I had hit this post and turned over. . . .

"Q. Well, thought you said you dozed at the time this accident happened?

"A. Well, that I could not possibly do, because it happened (snapping his fingers)—just like that—. . . .

"Q. Now, in your direct examination, you used the expression that you felt yourself slipping, and said it happened like that, and snapped your fingers. Now, I will ask you if up to that time you had any warning, or any reason to believe that you might lose consciousness?

"A. At one time I remember nodding my head like that (indicating), and I jerked it up quick, and after that I did not remember anything more.

"Q. That was at the time of the accident?

"A. Yes."

He says that he had gotten "dozy" on other days while driving, and that when he felt himself getting "dozy" he would either stop on the roadside until he "regained consciousness," or would get his companion to drive.

Self and New testify that they noticed the car gredually veer from the right to the left side of the road; that there was no traffic on the road, and they thought nothing of the car moving from the right to the left side until it was approaching the left edge of the road; that they then looked at Oppenheim and called to him to "lookout;" that his eyes were half closed and that in a moment the car had run into the ditch and against the telephone pole, breaking it in two, and turning the car over. They estimate the

speed of the car at 40 to ,50 miles per hour, and that it traveled about 150 feet from the time it began to veer to the left until it struck the ·telephone post. Other witnesses who arrived at the scene immediately after the accident examined the tracks from the point where the car began to veer to the left and they stepped off the distance from that point to the telephone post and their measurements showed that the distance was about 150 feet. In traveling at 40 to·50 miles per hour the car would travel this distance in 2 to 2½ seconds.

▆ Oppenheim testified that he was·alert and wide awake up to the time that he nodded and that he had no warning that he was going to sleep. The medical testimony is that sleep does not come unheralded, but that it is a scientific fact that there are premonitory symptoms and signals of warning. There is no other explanation of Oppenheim's lapsing into unconsciousness. Indeed, we think his own testimony, from which we have quoted, shows that he knew he went to sleep. There was certainly evidence to warrant putting the case to the jury.

▆ The authorities agree that one who goes to sleep while driving an automobile is guilty of negligence. In Lea v. Gentry, 167 Tenn., 664, 73 S. W. (2d), 170, 174; the driver went to sleep, and the car left the highway, and ran into a tree injuring the plaintiff. The principal defense was that the plaintiff was guilty of contributory negligence because he was himself asleep. The court say:

"The evidence amply showed sufficient negligence of the driver, Crump, to take the case to the jury. No defect in the car or other excuse appearing, he was manifestly negligent in running it off the road."

In Bushnell v. Bushnell, 103 Conn., 583, 131 A., 432, 435, 44 A. L. R., 785 the court say:

"In any ordinary case one cannot go to sleep while driving an automobile without having relaxed the vigilance which the law requires, without having been negligent. It lies within his own control to keep awake or cease from driving. And so the mere fact of his going to sleep while driving is a proper basis for an inference of negligence sufficient to make out a prima facie case, and sufficient for a recovery, if no circumstances tending to excuse or justify his conduct are proven. Carlson v. Connecticut Co., 95 Conn., 724, 112 A., 646; Sliwowski v. New York, N. H. & H. R. Co., 94 Conn., 303, 309, 108 A., 805; 1 Shearman & Redfield, Negligence, section 58a et seq.; posthumous paper of Ezra Ripley Thayer, 29 Harvard Law Review, 807. If such circumstances are claimed to have been proven, it then becomes a question of fact whether or not the driver was negligent; and, in determining that issue, all the relevant circumstances are to be considered, including the fact that ordinarily sleep does not come upon one without

warning of its approach. 5 Wigmore, Evidence (2 Ed.), section 2491.''

In Blood v. Adams, 269 Mass. 480, 169 N. E., 412, 413, the sole issue presented was, ''were the injuries sustained by the plaintiff caused by the gross negligence of the defendant?'' The defendant testified that ''he must have fallen asleep;'' that he ''probably fell asleep;'' that he ''did not remember just what happened preceding the accident;'' that ''as he came along he felt as though he wanted a cigarette, and when he lit the cigarette the light blinded him, and the next thing he knew his car was wrecked and they were injured;'' and that ''just previous to the accident he felt very sleepy, and felt as though . . . he should have a cigarette . . . he must have closed his eyes, for the next he knew they were injured and his car was wrecked.'' The court say:

''In the above stated circumstances it is undisputable that the defendant was negligent. In the exercise of ordinary care an operator of an automobile must be able to anticipate what is coming, to see what is present and to remember what is past. Voluntarily to drive an automobile on a public street at any time of day or night with eyes closed, or to yield to sleep while operating such kind of dangerous machine as is an automobile on a public highway, is to be guilty of a degree of negligence exceeding lack of ordinary care, and is a manifestation of recklessness which may be found by judge or jury to be gross negligence within any reasonable definition of that phrase. Altman v. Aronson, 231 Mass., 588, 121 N. E., 505, 4 A. L. R., 1185; Manning v. Simpson, 261 Mass., 494, 159 N. E., 440; Bushnell v. Bushnell, 103 Conn., 583, 131 A., 432, 44 A. L. R., 785.''

In Devlin v. Morse, 254 Mich., 113, 235 N. W., 812, the court held that a motorist falling asleep while driving, resulting in an accident, was negligent and liable to a gratuitous guest riding with him. The court cited and quoted with approval from the case of Bushnell v. Bushnell, supra.

In Whiddon v. Malone, 220 Ala., 220, 124 So., 516, 518, the court say:

''Without extended discussion, we hold that going to sleep at the wheel while operating a car is evidence of negligence. The dangers of running a car while asleep are so obvious as to need no comment. It is the duty of the driver to keep awake or cease to drive. A failure so to do is prima facie evidence of negligence. The burden passes to the defendant to show some unusual cause of his falling asleep which reasonable diligence could not foresee nor forestall.''

A careful review of the evidence convinces us that the evidence warranted putting the case to the jury, so the first assignment of error will be overruled.

■ The second assignment of error complains of an instruction given to the jury in the charge with reference to Self being a fellow servant of Oppenheim, which claim was in turn based upon the assumption that Self had been loaned by the China Company to Rice-Stix. The instruction complained of is too long for convenient quotation here; it is sufficient to say that we see no error in it prejudicial to the defendant. The court would have been warranted in instructing the jury, under the undisputed evidence in the case, that Self was not a loaned servant, and that the fellow servant relationship with Oppenheim did not exist. The facts were not in dispute, and the court might well have determined this issue as a matter of law instead of submitting it to the jury. See La Rose v. Donnelly, 219 App. Div., 181, 219 N. Y. S., 148, 151.

The exact question was determined in the case of George A. Fuller Co. v. McCloskey, 228 U. S., 194, 33 S. Ct., 471, 473, 57 L. Ed., 795, where the court say:

"The principal argument for reversal is based on the ruling of the trial court that Locke, the operator of the elevator, was the servant of the Fuller Company. The court below approved this ruling and we find no error in its conclusion. So far as Locke's employment was concerned, there was no dispute as to any matter of fact, and the question of the liability of the Fuller Company for his negligence, if he was negligent in the operation of the elevator, was one of law."

Second assignment overruled.

■ The third assignment complains of an instruction to the jury that the plaintiff occupied the status of a passenger for hire, and that the defendant owed him that degree of care which the court had just explained (ordinary care). The objection is that this was in effect telling the jury that plaintiff and Oppenheim were not fellow servants. As we have already shown, the undisputed proof shows that they were not fellow servants. However, the court in a later part of the charge fully explained to the jury the fellow-servant doctrine, and instructed them that if under the evidence they found that Self was a fellow servant of Oppenheim he could not recover.

Assignment No. 3 is overruled.

Assignments of error Nos. 4 to 8, inclusive, are based upon the action of the court in refusing certain special instructions requested by the defendant. These special requests all relate to the working arrangement between the China Company and defendant under which Self was to travel with the Rice-Stix salesmen, and sell to their customers, and other facts from which it was contended that Self was a loaned servant.

The request which is the basis of the fourth assignment is to the effect that it is the duty of the jury to reconcile the testimony of

every witness, if possible; and if a witness testified to a material fact in another trial between the same parties, and testified differently in the present trial and the two versions cannot be reconciled, then the jury should reject all of the testimony of the witness, as to such matter; and if they found that the plaintiff Self testified in the former suit that he had "knowledge of all the material facts of the arrangement under which he was working, and has testified that he was entirely satisfied with said arrangement as outlined in his first testimony; . . . and if you further find that on this trial the plaintiff testified that he did not know of any control that the Rice-Stix Dry Goods Company had over him, and that he did not consent to, or would not have consented to; any control by the Rice-Stix Dry Goods Company, then it becomes your duty to reconcile all of his testimony with respect to this question, if you can, and to find that in his latter testimony he did not mean that the Rice-Stix Dry Goods Company did not have the authority and control over him which he had theretofore said that it did have.

"However, if you are unable to reconcile his testimony with respect to this particular matter, you must accept that part of his testimony which is corroborated by the witness Craddock, and should reject such parts of the plaintiff's testimony which cannot be reconciled with his testimony which is corroborated by the witness Craddock."

■ It was not error to refuse this instruction. In the first place, we see no irreconcilable conflict in the testimony of the witness on the two trials. The testimony on the first trial that he knew of the working arrangement under which he was to travel with the Rice-Stix salesmen, and was satisfied with it, and his testimony on the present trial that the Rice-Stix Company had no control over him, and that he did not consent to such control, is not in irreconcilable conflict.

It was urged with much earnestness by the defendant throughout the trial of the case that because the plaintiff travelled with the Rice-Stix salesmen, and that they determined the territory to be covered and the customers to be solicited; and because the Rice-Stix Company passed upon the credit of the customers and accepted or rejected the orders as it saw fit, and because the plaintiff acquiesced in this arrangement, he was thereby a loaned servant, under the complete control and direction of the defendant and a fellow servant of Oppenheim.

This argument ignores important and controlling facts, viz., that plaintiff was regularly employed by the China Company, sold its goods, was paid by it, and it received the manufacturer's profit on the sales made by him. In traveling with the Rice-Stix salesmen he was acting under the direction of his superior, Mr. Craddock,

the sales manager of the China Company. Mr. Nousdon, of Rice-Stix Dry Goods Company arranged his engagements with the different salesmen; each salesman had his particular territory and knew his particular customers; as Self was traveling with these salesmen he naturally adjusted his schedule to theirs. These were not matters of control over Self, but were mere selections of time when the two were to go in company. He was nevertheless furthering the business of his regular employer in working under this arrangement, and the fact that Rice-Stix & Co. gave directions about the details of the work did not change the relation that he bore to the China Company. See quotations from La Rose v. Donnelly, supra, Driscoll v. Towle, supra, and Standard Oil Company v. Anderson, supra.

██ ██ The instruction is open to the further objection that it invaded the province of the jury in instructing them that it was their duty to "find that in his latter testimony he (plaintiff) did not mean that the Rice-Stix Dry Goods Company did not have the authority and control over him which he had theretofore said that it did have." It is for the jury and not for the court to pass upon the credibility of the witness and the meaning and probative effect of his testimony.

Assignment 4 is overruled.

██ The fifth assignment relates to the refusal of the court to give a special instruction to the jury upon the same proposition. It contained an instruction that if the jury found certain facts with reference to the working arrangement to be true, the plaintiff could not recover. It particularly invites the jury to find that the China Company sold its chinaware to Rice-Stix & Co. and that the latter in turn sold to its customers. There is no evidence to warrant the jury in making any such finding. There is no evidence that the China Company sold the goods to the Rice-Stix Dry Goods Company, and that the latter then sold them to its customers. The undisputed evidence is that the plaintiff, acting for the China Company, sold the chinaware to the Rice-Stix customer; and when the Rice-Stix Company approved the order, the goods were shipped to the customer; the China Company then, and not until then, billed the order to the Rice-Stix Company.

Assignment 5 overruled.

██ The sixth assignment of error complains of the refusal of the court to give a special instruction upon the same subject; it instructed the jury, if they found certain facts to be true, to return a verdict for the defendant. The facts recited in the instruction are those relied upon by the defendant as showing that the plaintiff was a loaned servant. The facts recited do not show that the Rice-Stix Company exercised any control over the plaintiff, or

that it had the right to exercise such control, or that plaintiff consented to such control.

Assignment 6 overruled. In this connection it should be stated that the court charged the jury fully and accurately in the general charge on the subject of the loaned-servant and fellow-servant doctrines.

The seventh assignment complains of error in the action of the court in refusing to give a special instruction that the fact that the Crescent China Company paid the plaintiff, and that it was interested in the sale of the chinaware did not affect or prevent the application of the doctrine of loaned servants; and the eighth assignment complains of the refusal of the court to charge that the fact that the Crescent China Company owned the samples which plaintiff used did not affect or prevent the application of said loaned-servant doctrine. These requests were properly refused because they do not correctly state the law. The facts that the China Company was interested in the sale of the china, that it paid Self for his services, and that it owned the samples which he carried, were all important facts bearing upon the loaned-servant doctrine.

Assignments 7 and 8 overruled.

The ninth assignment complains of the action of the court in charging the jury with reference to the Georgia speed statute (40 miles per hour), because plaintiff had acquiesced in the speed at which he had driven, and was therefore guilty of contributory negligence. The speed at which the car was being driven was a fact to be considered by the jury along with the other facts, in determining liability for the accident. It was shown, and the court correctly charged the jury, that the contributory negligence of the plaintiff does not bar a recovery in the state of Georgia, unless the contributory negligence of the plaintiff, as a proximate cause of the accident, is equal to, or greater than, that of the defendant. The comparative negligence rule prevails in the state of Georgia, and if the plaintiff's negligence as a proximate cause of the accident is less than that of the defendant, the plaintiff may still recover. The court accurately charged the jury as to this.

Assignment 9 overruled.

The tenth assignment of error is based upon the refusal of the court to give an instruction to the effect that the jury must receive testimony that is not impeached or contradicted. The record is singularly free of contradictions in the testimony, and certainly there are no material contradictions in the evidence as to any determinative issue. Granting that the requested instruction is not objectionable in form, it was still not prejudicial error to refuse it.

Assignment 10 overruled.

The eleventh assignment complains of the refusal of the court to grant a special request to the effect that the plaintiff could

not recover if his injuries resulted from an unavoidable accident, and that if they found that Oppenheim was suddenly stricken with unconsciousness, resulting in his losing control of the car, their verdict should be for the defendant. There was no evidence to warrant the giving of this request. Oppenheim himself did not testify to having been suddenly stricken with unconsciousness. The plain effect of his testimony was that he went to sleep. The substance of the request, however, was given in the general charge. The court charged the jury that if the accident was unavoidable, and if Oppenheim was guilty of no negligence, they should find for the defendant.

Assignment 11 overruled.

Assignment 12 complains of the refusal of the trial judge to grant a special request charging that if the plaintiff could have avoided the accident by the exercise of ordinary care he would not be entitled to recover. The court did give this instruction to the jury in the general charge, in the following words:

"I further charge you, therefore, gentlemen, that it is also the law applicable to this case, that if the plaintiff by ordinary care could have avoided the consequences to him caused by the negligence of the defendant,—the driver's negligence, if any there was, then, in that event the plaintiff cannot recover, but is barred."

Assignment 12 overruled.

Assignments of error Nos. 13, 14, 15, 16, and 17, all complain of the action of the court in admitting in evidence over objection of the defendant, the testimony of Alex. W. Smith, a member of the Atlanta bar, who testified as an expert as to the law of the state of Georgia. The objection is that it was for the court, and not a witness, to interpret the law of another state to the jury. The testimony of this witness is supported by reference to appellate court decisions in that state, and the decisions themselves are furnished to the court. The trial judge charged the jury as to the law of the state of Georgia in accordance with the testimony of this witness, and it is not now claimed that his charge thereon was incorrect. It was explained by his testimony that the law of Georgia differs from that of Tennesse by the substitution of comparative negligence for proximate and remote contributory negligence. It is not claimed that the witness stated the law of Georgia on this question incorrectly. His testimony was merely the vehicle by which the decisions of the state of Georgia were brought to the court, and it was not error to admit it.

Assignments 13 to 17, inclusive, overruled.

The eighteenth assignment of error complains of error in the admission over defendant's objection of the testimony of the witness New to the effect that the driver had time, if he had acted very promptly, to straighten out the car and bring it back to the

road, after New had called to him to "look out." The answer of the witness was, "If he had heard me, and I think he did, if he had taken action at once, he could have recovered the car by easing it back further on the road, instead of going further in the ditch." The objection to this is that it was the expression of the opinion of the witness. Witnesses are commonly permitted to estimate the speed of an automobile. This is because the use of automobiles is so common, and the opportunities for observation are so great, that the average witness is able to testify with a fair degree of accuracy as to the speed at which a car is being operated. For the same reason one accustomed to handling automobiles may testify with reasonable accuracy what a driver could or should have done in a given situation. The witness would have been permitted to testify that the car was a certain number of feet from the edge of the road or from the telephone pole, when he called to the driver to look out, and that it would travel that distance in a quarter of a second, or half a second, and that the car could have been straightened out in a less time. This would have been a roundabout and inaccurate way of expressing the idea that the driver had sufficient time to straighten out the car. It would not have been objectionable if the witness had measured the time in split seconds; but it was a more accurate way to express it as he did. It was not error prejudicial to the defendant to admit this testimony.

Assignment 18 overruled.

The nineteenth assignment of error is that the court erred in failing to tell the jury that if they found the defendant's theory was established by the evidence, they should find for the defendant. The defendant had several theories, each one of which was stated to the jury, and in each instance it was stated that the verdict should be for the defendant if its theory was sustained.

Assignment 19 overruled.

The twentieth assignment of error is that the court erred in refusing to set aside the verdict and grant the defendant a new trial upon the ground that the verdict was so excessive as to evince passion, prejudice, and caprice on the part of the jury; and the twenty-first assignment is that the verdict, even after deducting the remittitur, is grossly excessive.

The jury returned a verdict in favor of the plaintiff for $40,000. The trial judge was of opinion that this amount was excessive, and suggested a remittitur of $15,000, which was accepted under protest.

As a result of the accident the plaintiff was rendered unconscious, and his right arm was broken between the elbow and shoulder, and was almost completely severed from the body. He was taken to a doctor at Hagan in about twenty minutes, but this doc-

tor was not a surgeon and could do nothing for him; he was then taken to Dr. Daniels at Claxton, about two miles from Hagan, but Dr. Daniels could not be found. Plaintiff was suffering excruciating pain, and a nurse in Dr. Daniels' office administered a hypodermic, but this afforded no relief. Dr. Daniels came in about an hour and twenty minutes. He at once called an ambulance to take the plaintiff to a hospital in Savannah, and applied a tourniquet to stop the flow of blood. The plaintiff was by this time greatly weakened by the loss of blood. Dr. Daniels went in the ambulance with him to Savannah. They arrived there about 7 o'clock. A general anæsthetic was then administered and his arm was amputated by Dr. Usher. While in the hospital a tetanus antitoxin was administered, which was itself a shock to the system, and caused a serum rash. He remained in the hospital for twelve days, during all of which time he suffered great pain; he was extremely nervous and sleepless; he called the attention of the doctors to pain in other parts of the body, but they did not make any X-ray pictures.

He returned from Savannah to his home in Memphis by train. He continued to suffer great pain in his arm, head, and shoulders, had continuous headaches and was extremely nervous. He was unable to sleep, and suffered great pain from the arm which had been amputated. For several months he was unable to bathe and dress himself, and at the time of the trial four years after the accident, it was exceedingly awkward for him to dress himself.

At the time of the accident he was 44 years of age and had an expectancy of life of 25.3 years. He was a sturdy, sober, and industrious traveling salesman, and had no difficulty in handling his sample case which weighed from 40 to 50 pounds. He had an earning capacity of about $50 per week, or $2,500 per year.

Prior to the accident he was a man of cheerful disposition, but since then he has been nervous, cannot stand a noise, is timid in a crowd, and has frequent spells of nausea; he was offered his position with the China Company but could not take it; he has been unable to do any kind of work. The accident happened on September 12, 1930, and the case was tried on September 18, 1934, or four years later. Prior to the accident he was a normal man sexually, but since that time his sexual capacity vanished and that condition had not improved up to the time of the trial in September, 1934. This, in itself, had a depressing effect upon him mentally.

The trial of a former suit between the same parties was had in November, 1931. A voluntary nonsuit was taken in that case. Shortly before that trial the plaintiff was examined by Dr. Henry G. Hill, a specialist in orthopedic surgery, and X-ray pictures were made by Dr. Bethea, an X-ray specialist. Dr. Hill was of opinion

that Self was suffering from chronic neuritis of the stump; that the nerves were caught in the scar tissue, that the bone fragment is too long for the soft tissue, and that this would intensify his nervousness. An examination made shortly before the last trial showed no improvement in his condition, and that his dizziness and nervousness may have, and probably were caused by a concussion of the brain as the result of the automobile accident.

The X-ray pictures showed a fracture of the clavicle or collar bone, and of the seventh, ninth, and tenth ribs, the ninth rib being pulled loose from the spine. There was also a knot or tumor the size of half a lemon on the breastbone or sternum, all of which injuries Dr. Hill attributed to the accident. Dr. Hill's prognosis as to his future condition was that the plaintiff was a nervous wreck, and will be permanently wrecked so far as his nervous system is concerned, and that he will never be able to perform any mental or physical labor.

Dr. R. C. Bunting, specialist in neurology, examined Mr. Self first in 1931 prior to the first trial, and again shortly before the second trial He found a traumatic neurosis, symptoms of which are headache, dizziness, tiring easily, insomnia, irritability, inability to concentrate, an outstanding degree of anxiety, sexual inability, change of personality, the individual changing from a bright, cheerful person to one who is irritable and morose, and has lost his ambition in life. He attributed Self's condition to the automobile accident, and found no improvement between his first and second examinations. He testified that this traumatic neurosis was a serious handicap, and was of opinion that Self would never be able to resume his work as a traveling salesman, or any other gainful vocation.

Dr. Carroll Turner, also a specialist in neurology, with the permission of the plaintiff, examined him in behalf of the defendant. He was present at the courthouse during the trial of the case, and talked to the defendant's attorney, but was not called as a witness.

Dr. Meadors, Self's family physician, testified that he was strong and vigorous before the accident, in excellent health, and weighing about 165 pounds; that since the accident he had been highly nervous, constantly complained of pain, especially in his right chest and in his amputated arm; and that his nervous condition had grown progressively worse. At the time of the trial his weight was 127 pounds.

Dr. Usher was the surgeon who amputated Self's arm. He testified that Self was suffering great pain while in the hospital; that his nerves were upset; that he was given a tetanus antitoxin which caused a serum rash and had to be treated with adrenalin. He examined him again when the doctor's deposition was taken, and found that he had a very painful stump, and would have to have a reamputation, or have the nerves cut in order to get relief.

The plaintiff's medical and hospital bills up to the time of the trial amounted to $600.

We have discussed the testimony of the witnesses as to the plaintiff's injuries and as to his condition before and since the accident, at this length, because of the size of the verdict. There is evidence that the plaintiff is a physical and nervous wreck and that he will never be able to engage in any profitable occupation. The plaintiff claimed the following elements of damages based purely upon compensation for his injuries:

Loss of earnings to date of trial, 4 years at $2,500.00
 per year _____ $10,000.00
Hospital and Medical Bills paid, _____ 600.00
Expense for reamputation of arm _____ 600.00
Permanent loss of earnings at $100.00 per month, (one-
 half his earnings at time of accident. Present cost
 of an annuity to pay $100.00 per month for his ex-
 pectancy at age 48, the time of the trial .......... 18,373.20
Compensation for permanent loss of arm, injuries,
 weakness and impotency, $50.00 per month. Pres-
 ent cost of annuity to pay this amount from age 44, 9,875.00

 $39,448.60

This statement makes no claim for pain and suffering.

 ██ There is no claim that the verdict was a dishonest or corrupt one. In such a situation the verdict of the jury is entitled to much weight. Next to the jury it is for the trial court to pass upon the amount of the damages recoverable. Reeves v. Catignami, 157 Tenn., 173, 176, 7 S. W. (2d), 38; Kroger Grocery & Baking Co. v. Addington, 18 Tenn. App., 191, 199, 74 S. W. (2d), 650. The judge in this case has suggested a substantial remittitur which has been accepted by the plaintiff under protest. We do not feel warranted either in granting a new trial upon the ground that the verdict was so excessive as to evince passion, prejudice, corruption, or caprice on the part of the jury, or in suggesting a further remittitur. We therefore overrule the 20th and 21st assignments of error.

 The twenty-second assignment of error is that the court should have sustained the defendant's objection to the argument of plaintiff's counsel that the jury should allow the plaitniff $20,000 for loss of future earnings, in addition to other items of damages claimed. There was evidence to warrant the argument and we see no objection to it.

Assignment 22 overruled.

The twenty-third assignment of error is based upon the action of the court in refusing to permit the witness, Dr. J. J. McCaughan to answer a certain hypothetical question. The assignment is not well made because the record fails to show how the witness would

have answered the question. It does not appear, therefore, that the defendant was prejudiced by the refusal of the court to permit the witness to answer. Weeks v. McNulty, 101 Tenn., 495, 48 S. W., 809, 43 L. R. A., 185, 70 Am. St. Rep., 693; Stacker v. Railroad, 106 Tenn., 450, 61 S. W., 766. Assignment 23 overruled.

Assignments 24 and 25 complain of the action of the court in permitting Dr. Hill and Dr. Bunting, expert witnesses for the plaintiff, to testify that certain physical conditions suffered by the plaintiff since the accident, were probably caused by the accident. We see no objection to the testimony. The witnesses only testified that in their opinion the injuries described probably resulted from the accident. The objection to the testimony was that the witnesses were thereby permitted to invade the province of the jury. The assignment is not well made. National Life & Accident Ins. Co. v. Follett, 168 Tenn., 647, 80 S. W. (2d), 92.

Assignments 24 and 25 overruled.

All of the defendant's assignments of error having been overruled, it results that it is not entitled either to a reversal of the judgment, or to a further remittitur upon the ground of the excessiveness thereof.

This brings us to the consideration of the plaintiff's appeal. As already stated, there was a verdict of $40,000 in his favor. On the hearing of the motion for a new trial the trial judge, "being of opinion that the verdict of the jury is excessive, but that said error can be corrected by a remittitur of fifteen thousand dollars," suggested a remittitur of that amount, and the plaintiff accepted it under protest, and appealed from the action of the court in requiring it as a condition of the denial of a motion for a new trial, as provided by section 8987 of the Code.

The trial judge overruled the ground of the motion for a new trial that the verdict was so excessive as to evince passion, prejudice, corruption, and unaccountable caprice on the part of the jury, and suggested the remittitur solely upon the ground that the verdict was excessive, as he was authorized to do under the case of Grant v. Railroad, 129 Tenn., 398, 406, 409, 165 S. W., 963. There is no intimation in his ruling that the jury were actuated by any improper motives, and the remittitur was not suggested upon any such ground. The plaintiff is therefore not entitled to have the remittitur set aside and the original verdict restored. By the plain terms of the statute, it is only when the remittitur is suggested by the trial judge upon the ground that the jury was prompted by such improper motive that this court can review his action and restore the original verdict. Yarbrough v. L. & N. R. R. Co., 11 Tenn. App., 456, 460.

The plaintiff's assignments of error will therefore be overruled. All the assignments of error of both the appellants having been

overruled, it results that the judgment of the trial court will be in all respects affirmed. The costs of the appeal will be paid one-fourth by the plaintiff, C. P. Self, and surety, and three-fourths by the defendant, Rice-Stix & Co., and surety.

Senter and Anderson, JJ., concur.