# INTERNATIONAL HARVESTER CO. et al.
## v. SARTAIN.—222 S. W. (2d) 854.

Jackson. May 21, 1948.

Petition for Certiorari denied by Supreme Court, March 11, 1949.

428

430

A. Longstreet Heiskell (of Chandler, Shepherd, Heiskell & Williams), of Memphis, for International Harvester.

Cooper Turner, Jr., and Chas. L. Neely, both of Memphis, for Virginia Engineering Co.

Evans, Exby, Moriarity & Creson, of Memphis, for Ira Sartain.

SWEPSTON, J. This is an appeal in the nature of a writ of error from a jury verdict and judgment.

Suit was brought by Ira Sartain against the defendants, International Harvester Company, Virginia Engineering Company and Memphis Light, Gas and Water Division of the City of Memphis for personal injuries arising out of contact with a high voltage electric wire.

There was a verdict for $60,000 against the first two named defendants and a verdict of not guilty in favor of the third named defendant.

The trial judge suggested a remittitur of $20,000, which was accepted under protest and Ira Sartain has appealed therefrom seeking a restoration to the original amount.

There is no dispute about the ultimate material facts.

International, as the first plaintiff-in-error will be referred to, was procuring the erection of a large factory on a tract of about 152 acres located a few miles north of Memphis and between Highway 51 and the Mississippi River just west of the suburb of Frayser.

There was, of course, an overall plan of the entire permanent layout, but International, so far as appears from the evidence, executed none of the work itself but had all of it done by independent contractors, but it did reserve the right to do work as it might elect.

Virginia, as the second plaintiff-in-error will be designated, was the largest contractor and is referred to in its contract as the "principal contractor", but, while it had numerous sub-contractors, there were in fact other independent contractors working on the premises simultaneously with Virginia who had no connection with Virginia but were direct independent contractors with International.

All these contracts provided that each contractor should so manage as that all work be carried on harmoniously and concurrently among themselves.

The structure, on which Sartain was working as a steel construction worker when injured, was one of twelve or more single story steel buildings in a row, some of which were contiguous and some adjacent to one another.

The contract for the fabrication and construction of these buildings was direct from International to Gage Structural Steel Company and the work was being done by its sub-contractor, Beasley; so that Gage was the remote and Beasley the immediate employer of Sartain. Virginia had no connection with his employment, nor with the Gage contract in any manner and Gage had no need for and was not using the electricity or tools provided by Virginia.

With this preliminary a fair statement of the contracts and the facts so far as here pertinent is taken from the brief of International, with the insertion in paragraph 4 of the words "owner and" just preceding "all con-

tractors'', and with the exception of its No. 8, which will be later discussed.

"1. That Virginia will furnish all tools, labor and materials to erect in place the manufacturing plant, and employ and direct all persons performing the work.

"2. That Gage will fabricate and erect the structural steel at the Memphis plant and will employ and direct all persons performing the work.

"3. That International will provide water on the plant site for all contractors.

"4. That Virginia will provide temporary electrical power on plant site for owner and all contractors.

"5. That the contractors agree to use every safeguard and protection against injury and to be solely responsible for injury of any person, whether workman or otherwise.

"6. That the contractors agree to indemnify International from liability for injuries to any person in connection with or growing out of the work.

"7. That International retains no direction or control over the manner in which the contractors perform their work; the contractors remain 'independent contractors.'

"8. That International reserves no control over the premises, save that its superintendent shall have access to the premises for inspecting and estimating the amount of the work, seeing that the work is done according to the contract, and interpreting the plans and specifications in case of uncertainty.

"9. That the owner shall not occupy the building prior to completion, unless the contractor shall give, in writing, his authorization therefor.

"10. All contractors and subcontractors are required to qualify under the Tennessee Workmen's Compensation Law.

"In the course of the work, according to the provisions of the contract, the owner did not assume any control of the contractors as to the manner in which they did their work, the persons they employed or the direction of their work. The superintendent and his assistants were on the premises, not to assume custody or control of the work or to direct safety precautions or to designate the persons to be employed or other details, but solely to inspect and estimate the amount of work, interpret plans and make decisions on any disagreements. The superintendent of International was acting in the capacity of engineer-architect at the site of the work. International was not doing any work of its own at the site of the accident.

"In fulfilling its contract obligations to furnish water, International had the Light Division construct a temporary power line from the north side of the plant site to the pump located at the well. This line was not involved in the accident.

"In fulfilling its contract obligation to furnish power to all contractors, Virginia had the Light Division construct a power line from the pole near the well southeastwardly by the site of building No. 4 to building No. 2 (Site Plan, Ex. 4, Schlobohm, R. Ex. Vol., p. 85). This is the line that was involved in the accident.

"When the line last above mentioned was erected, building No. 4 (on which plaintiff was working when injured) had not been erected, but the foundations for the wall were in place. When the structural steel was

erected, the column and truss at the southwest corner of the building No. 4 were approximately four feet, eight inches, from the temporary power line to building No. 2 (J. C. Michaels, R. Vol. III, p. 656). No accident occurred in the erection of this steel.

"On the date of the accident, the plaintiff Sartain and another steel worker, Lee Taylor, were placing tie rods in the roof trusses. These tie rods, or brace rods, run diagonally from the base of one truss to the apex of the next truss, tying them together. The tie rod is a flexible steel rod about one inch in diameter and thirty feet in length; it was elevated to the gutter line by means of ropes and was then put in place by one of the steelworkers going up to the apex of one truss with one end of the rod, while the other worker "fed" the rod to him and then fixed the other end in the lower corner of the adjoining truss.

The space encompassed within any four columns of these structures is called a "bay" so that each building is composed of a row of bays each 22 feet between any two columns on the same side. Resting on top of the columns are roof structures pointing up to the apex. In bringing up these very flexible rods and working them into the diagonal position it is usual and necessary for one worker standing at the base of the roof structure to pay the lower end of the rod back over the side of the building, then pay the other end carefully back to another worker holding the upper end and climbing up the roof truss to the apex. This operation requires concentrated attention and care so as not to throw the climber off balance and cause him to fall from the truss to the ground.

At the time of the accident Sartain and Taylor were standing in a gutter 20 inches wide on the south side of building No. 4. They had begun work toward the east end and worked toward the west and were in the act of putting in the last tie rod. Sartain was near the southwest corner of the building facing east and Taylor was about 20 feet east of him facing west. As Sartain was handling his end of the rod over the side and the gutter, the rod came in contact with the high voltage power line which was about 3 feet from the corner of the gutter and about six inches lower.

Taylor was killed instantly and fell back in the gutter. Sartain was caused to fall about 28 feet to the paved road which ran along the south side of that building, so that he suffered injury both from the electricity and the fall, which will be adverted to later.

All parties to these contracts, including International, carried Workmen's Compensation and plaintiff was under the Act. He did not sue either Beasley or Gage, but sued as previously stated.

Plaintiff has entered into an agreement with Beasley's insurer as follows:

"Stipulation

"Whereas, Ira Sartain, was an employee on December 17, 1946, of the John F. Beasley Construction Co., and did on said date receive certain injuries entitling him to compensation under what is known as the Workmen's Compensation Law of Tennessee, and

"Whereas, the Liberty Mutual Insurance Company is the insurer of said employer and under said compensation act stands in the place and stead of said employer, and

"Whereas, said employee desires to reserve his right of action arising out of the accident causing the injuries received as above mentioned against a third party, and

"Whereas, said insurer is willing to waive its right of action against said third party and to make certain advancements to said employee.

"Now Therefore, it is agreed that said insurer does waive all right of subrogation to employee's right of action against said third party and will make advancements to said employee, and said employee expressly reserves his said right of action against said third party and also agrees that in the event of a recovery from said third party to reimburse said insurer for said advancements or for and to the extent of his said recovery, if said recovery is not of sufficient amount to entirely liquidate said advancements.

"This is the 31st day of December, 1946.

> "/s/ A. E. Brake,
>> "Liberty Mutual Insurance Co.,
>> "Insurer.
> "/s/ Ira Sartain,
>> "Ira Sartain,
>> "Employee.

"Irene Sartain /s/."

Under this agreement the insurer has advanced plaintiff not only the amounts due under the Act but also over $3,000 more.

The negligence charged against all defendants is:

That they located, erected, controlled, maintained and operated a high tension line in perilous proximity to a

steel structure. That they failed to insulate same, failed to take any precautions to guard workers from contact with the wires, as required by ordinary care, without warning the workers rightfully on the premises and did knowingly transmit high voltage through said wires.

The proof is undisputed that the wires were not insulated, but there was proof that wires of such high voltage could not be insulated successfully by the usual covering on wires of slight voltage, but that sleeves slipped over the wires were used at times by electrical companies to protect workers.

It is undisputed that they were about 56 inches from the corner of building No. 4.

There is no evidence that Sartain had been warned of the danger, or had ever seen the wires.

There was evidence that the wires could be easily seen overhead from the ground to one looking up. But there was evidence that the wires were difficult to see from above looking down on them.

There was evidence that wires of such voltage should be not less than eight feet from a building to avoid danger of arcing or jumping of the current.

Numerous assignments of error have been filed by both plaintiffs in error.

International by No. II and V and Virginia by No. I (d) and (e) raise two questions which could be determinative of both appeals. Therefore, we consider them first.

First, it is urged that since plaintiff was entitled to compensation under the Statute, that is his only remedy, and a suit cannot be maintained at common law against plaintiffs in error.

Second, that plaintiff has accepted compensation under

the Statute and that the agreement entered into with his immediate employer's insurer is not sufficient to reserve to himself the right of action, if any, against plaintiffs in error.

The first proposition is predicated upon Code Section 6866, i. e. Section 15, of the original act; the second hinges on Code Section 6865 or Section 14, as modified, of the original.

It is apparent that if plaintiffs in error are correct about the second proposition, it is conclusive under either section. Hence, we discuss it first.

We here copy the two sections:

"6866. Liability of principal or intermediate contractor for injuries; remedies against third person liable for the injuries; claim instituted against immediate employer; no waiver; place of accident.—A principal, or intermediate contractor, or subcontractor shall be liable for compensation to any employee injured while in the employ of any of his subcontractors and engaged upon the subject-matter of the contract to the same extent as the immediate employer.

"Any principal, or intermediate contractor, or subcontractor who shall pay compensation under the foregoing provisions may recover the amount paid, from any person who, independently of this section, would have been liable to pay compensation to the injured employee, or from any intermediate contractor.

"Every claim for compensation under this section shall be in the first instance presented to and instituted against the immediate employer, but such proceedings shall not constitute a waiver of the employee's rights to recover compensation under this chapter from the prin-

cipal or intermediate contractor, provided that the collection of full compensation from one employer shall bar recovery by the employee against any others, nor shall he collect from all a total compensation in excess of the amount for which any of said contractors is liable.

"This section shall apply only in cases where the injury occurred on, in, or about the premises on which the principal contractor has undertaken to execute work or which are otherwise under his control or management. (Ib. Sec. 15)."

"6865. Employee may proceed against employer and a third person liable for the injury, but cannot collect from both; employer's remedy against third person.— Whenever an injury for which compensation is payable under this chapter shall have been sustained under circumstances creating in some other person than the employer a legal liability to pay damages in respect thereto, the injured employee may, at his option, either claim compensation or proceed at law against such other person to recover damages, or proceed against both the employer and such other person, but he shall not be entitled to collect from both; and if compensation is awarded under this chapter, the employer having paid the compensation or having become liable therefor, may collect, in his own name or in the name of the injured employee in a suit brought for the purpose, from the other person against whom legal liability for damages exists, the indemnity paid or payable to the injured employee. (1919, ch. 123, Section 14, Modified)."

Plaintiffs in error criticize the agreement under which the advances are being made, because, they say, it reserves the right of recovery to the insurer at least in the

event the recovery be equal to or less than the amount of advancements; that it is contrary to the spirit of the statute that the employee be permitted to reserve the right of action against a negligent third party for the joint benefit of himself and his employer.

They seek to distinguish

Keen v. Allison, 166 Tenn. 218, 60 S. W. (2d) 158, 159, on the facts in that (1) the employer there reserved no benefit of the possible recovery and (2) that it appeared that no part of the sum paid by the employer covered the claim for malpractice against the attending physician.

Conceding the factual difference, we think it works no change in the principles announced in that case which are entirely applicable here. We quote some of the pertinent language:

"Workmen's Compensation provided by our statute is a form of accident insurance. Were it not for Section 6865 of the Code, above set out, we presume that an employee, for injuries sustained by an accident arising out of and in the course of his employment, such accident having been brought about or contributed to by a negligent third party, could recover compensation without prejudice to his right to recover damages likewise from the third party. As noted in Bristol Telephone Co. v. Weaver, 146 Tenn. 511, 243 S. W. 299, the Workmen's Compensation Act was passed for the benefit of employers and employees. The statute is little concerned with the rights of third parties, negligent wrongdoers. Section 6865 is clearly a provision for the benefit of the employer to prevent the employee recovering damages for injuries inflicted upon him by a third party and at

the same time recovering compensation from his employer for such injuries; to give the employer, paying compensation under such circumstances, a right of indemnity against the wrongdoer inflicting the damages.

"We find nothing in the policy of the law to prevent an employer waiving his aforesaid right of subrogation. No rights of the wrongdoer are affected. So far as he is concerned, it is not for him to say whether he be called upon to respond in damages at the suit of the employer or at the suit of the employee. The right of action against the wrongdoer accrues to the employee. The employer paying compensation may take this right of action from the employee or he may leave it with the employee. If, in the settlement between the employer and the employee, it is agreed that the right of action against the third party shall be left with the employee, we see nothing in such an agreement of which the third party can complain.

"Under statutory provisions similar to Section 6865 of the Code, it has been held in other jurisdictions that the employer and the employee might enter into a settlement whereby the employee reserved his right of action against the third person and whereby the employee agreed that if he recovered damages in the action against the third person, he would reimburse the employer."

The Court then discusses the cases from other jurisdictions applicable to the last quoted paragraph dealing with an agreement for reimbursement of advances made by the employer.

There is no case to the contrary in this state. We do not deem it necessary to discuss the cases cited in the brief such as Wilson v. City of Chattanooga, 179 Tenn.

234, 235, 165 S. W. (2d) 373, other than to say that the quotation on page 73 of Virginia's brief is erroneously stated to be the factual situation in the Wilson case, whereas it is a quotation in the Wilson case taken from Keen v. Allison, supra.

Also, the case of Walters v. Eagle Indemnity Co., 166 Tenn. 383, 61 S. W. (2d) 666, 88 A. L. R. 654 is easily distinguished: (1) there was a substantial settlement paid by the third party tort feasor under a covenant not to sue, (2) the right of action sought to be saved was that against the employer, which is the opposite of the present situation and which is not permitted by the Statute, (3) Keen v. Allison, supra, was referred to and properly applied, in that any reservation of a right of action is held to be for the benefit of the employer and employee, but not for a negligent third party, (4) so that a substantial settlement received from a third party is a collection that bars any compensation claim against the employer.

■ We, therefore, hold that the receipt of these advancements does not bar the present suit.

Adverting to the first proposition, plaintiffs in error seek to apply Code Section 6866, supra, and cite Mc-Veigh v. Brewer, 182 Tenn. 683, 189 S. W. (2d) 812, and several cases from other jurisdictions.

The effort is to bring International and Virginia under that section as "any principal, or intermediate contractor, or subcontractor."

We think the case of Odom v. Sanford & Treadway, 156 Tenn. 202, 299 S. W. 1045, is explicit authority for holding that International does not come under this Section.

Sanford & Treadway owned a tract of timber. They

constituted Birchfield & Garland independent contractors to cut and haul it. Mann Hughes, an employee of the latter was injured while felling a tree.

The Court said that Section 15, which is Code Section 6866, was not applicable, because Sanford & Treadway were neither of the three designated by the section. The Court cited Siskin v. Johnson, 151 Tenn. 93, 268 S. W. 630, 631.

In this latter case, the injury did not occur on the premises, but that was not the sole reason for the inapplicability of Section 15. The Court explicitly held that this section did not apply, because "Defendants were not principal contractors within the sense and meaning of said section. They had not contracted or undertaken to execute work for another, but had only employed Carter to perform certain work for them." Carter was an independent contractor.

As to Virginia, as shown by the statement of facts supra, it had no contractual relationship with Sartain nor with his immediate or remote employees, Gage Beasley, et al. Gage was the principal contractor on the steel work just as much as Virginia was on the other and larger activities covered by its contract.

To call Virginia the principal contractor, so far as the facts of this case go, would be to apply the situation of the amorous little king of France, who was said to be truly the father of his own country.

There may be and frequently are, many principal contractors engaged in the performance of separate contracts on the same premises just as unrelated fathers have their respective sets of children, who inherit only from the individual who is father to them.

The first paragraph of Section 6866 clearly provides that if a principal or intermediate contractor is to be liable it is because the employee is injured while "in the employ of any of his subcontractors and engaged upon the subject-matter of the contract to the same extent as the immediate employer."

Necessarily the opposite is true that if the injured person is not an employee of any of the subcontractors of the related principal or intermediate contractor, this section would have no application.

The gist of this section is relationship either ascending or descending or both.

In McVeigh v. Brewer, supra, Hercules was the only principal contractor. It let a contract to Stone & Webster Corporation, who "subbed" a part to Smith Stone Corporation who "subbed" a part to Keith Williams Company.

The plaintiff, Brewer, a truck driver for Keith Williams Company, was injured in a collision with a truck driver for Stone & Webster.

It was held that Brewer could not maintain suit at common law against Stone & Webster and its driver, as third parties, because Section 6866 limited his recovery to compensation under the Statute from any or all of the related parties above named.

Other cases referred to are analyzed in the opinion and need not be here discussed.

■ Briefly then, for Section 15 to be applicable there must be (1) relationship and (2) the injury must occur "on, in, or about the premises on which the principal contractor has undertaken to execute work or which are otherwise under his control or management." Absent either element, the section does not apply.

■ We, therefore, hold that Section 15 does not bar this common law action against either International or Virginia and we overrule these assignments of error.

Next we think we should discuss under International's Assignment I and III the basic legal question of the liability of International.

Counsel for all parties have submitted excellent and helpful briefs.

The theory of defendant in error, Sartain, is stated, pages 13 and 14 of the brief.

That International was owner of the premises where the accident occurred and that plaintiff as an .employee of Beasley was an invitee.

That International did not relinquish control of the premises to any one contractor but had many separate contractors working at the same time; that there was no one general contractor in exclusive possession of the premises.

That even though Virginia was an independent contractor, International is not relieved of liability, because under Article 30 of the specifications it contracted with Virginia that the latter would "provide and maintain all temporary electrical services for any and all contractors and the owner, for use of apparatuses, lights, or tools to facilitate the completion of the buildings."

That International is liable for direct negligence, as charged in the declaration, where in the general course of events mischievous consequences might be expected to occur, unless means are adopted by which such consequences might be prevented; that this duty cannot be delegated even to an independent contractor.

The theory of International is epitomized, page 3 of

its brief, in the question stated thus: "Whether the owner of the premises is obligated to insure or guarantee to protect an employee working for a subcontractor against the negligence of another contractor who assumes the responsibility for the safety of the premises on which the work is being done."

It is said that the charge of the court makes International practically an insurer of the condition of the premises.

Its theory more fully stated is:

That International did not construct the temporary line, was not in control of the premises, having surrendered same to the several contractors, who expressly assumed responsibility for the safety of the premises, which were safe when relinquished by it and that it is not responsible for the changing conditions as the work progressed and owed plaintiff no duty of providing him a safe place to work, and is not responsible for the casual or collateral negligence of any of the contractors, and that no negligence is shown.

On this theory International bases its assignments I, IV, XXI and XIII.

Counsel differ as to whether International was in control of the premises.

As we construe the contract International did reserve some control over the premises in the Virginia contract.

While it did not reserve control over the method and manner of the independent contractor's doing the work, nor of the servants, it did by Article 24 of the General Specifications provide: "Owner reserves the right to do such work as he shall elect and to let other contracts in connection with the work. The Contractor shall afford

owner and other Contractors full opportunity for the installation of equipment and machinery and storage of their materials, and in the execution of their work, and shall properly connect and coordinate his with theirs so that there will be no interference or delay in any manner with the work of the Owner and of other Contractors.''

That is to say, International had the right to do other work anywhere on the premises and it might do it either itself or through contractors who might be independent or not, and it might do work in the same location or in the same structure on which Virginia was working at the time, even though under Article 23 it could not use or occupy the premises so as to interfere with Virginia without its permission.

Hence, we apply one of the same tests as is used in determining whether one is an independent contractor. It is the right to control rather than the fact of controlling the method of doing the work, although actual control may be competent evidence tending to show the right to control.

International did not relinquish the right to enter upon any part of the premises either to do other work itself or through other independent contractors.

A case somewhat similar on the point is Kenny v. A. C. & H. M. Hall Realty Co., 85 Misc. 439, 147 N. Y. S. 976; 978.

■ The general rule is that an employer is not ordinarily liable for the negligence of an independent contractor.

■ There are, however, numerous exceptions to the rule, some of which are stated in McHarge v. M. M. Newcomer & Co., 117 Tenn. 595, 100 S. W. 700, 9 L. R. A., N. S., 298; Smith v. Bank of Commerce & Trust Co.,

135 Tenn. 398, 186 S. W. 465, 18 A. L. R. 788; Cash v. Casey-Hedges Co., 139 Tenn. 179, 180; 201 S. W. 347; Davis v. Cam-Wyman Lumber Co., 126 Tenn. 576, 150 S. W. 545, 547, in which last cited case are the following significant statements:

"It was well settled in Powell v. Virginia Construction Co., 88 Tenn. [692], 693, 13 S. W. 691, 17 Am. St. Rep. 925, that the employer of an independent contractor, if he be a fit and proper person, and the work be not in itself unlawful, or a nuisance in itself, or necessarily attended with danger to others, will not be responsible for the negligence of the contractor or his servants for injuries to third persons. This rule is based upon the principle that a person is not liable for the acts or negligence of another, unless the relation of master and servant or principal and agent exist between them.

"The rule itself, however, as may be gathered from the efforts of the various courts to state it, has important exceptions and qualifications. The doctrine that the owner of premises could interpose his contract between himself and liablity for the negligence of an independent contractor or his servants is of comparatively recent origin. It was held in England as late as 1799 in the case of Bush v. Steinman, 1 Bos. & P. 404, that the owner of premises was liable for the negligence of an independent contractor and his servants, though the court did not undertake to formulate any principle of the law to support the holding. Later cases of the English courts seem to understand that Bush v. Steinman could be supported upon the ground that the owner of the premises is liable where the injury was done in or near and in respect of his property in possession at the time. Laugher v. Pointer (1826), 4 L. J. K. B. 309. From that case and the later case of Quarman v. Burnett

(1840), 6 Mees. & W., 499, 9 L. J. Exch. N. S., 308, 4 Jur., 969, a distinction arose with respect to the work being done by the contractor on the premises of the owner and with relation to his real estate and contracts in respect of personal property; the full doctrine of independent contractor, as now understood, being applied by the court in cases where injury arose from the negligent employment of personal property by the contractor in the performance of his contract. This distinction was recognized by a number of American courts. Hilliard v. Richardson, 3 Gray 349, [69 Mass. 349], 63 Am. Dec. 743. But the distinction is no longer observed in any of the later cases, English or American. It may be now generally stated as a correct proposition of law that an employer is not liable for an injury resulting from the performance of work given over by him to an independent contractor, unless the work was unlawful itself, or the injury was a necessary consequence of executing the work in the manner provided for in the contract, or subsequently prescribed by the employer, or was caused by the violation of some absolute nondelegable duty which the employer was bound at his peril to discharge, or was due to some specific act of negligence on the part of the employer himself. Bibb's Adm'r. v. Norfolk & W. R. Co., 87 Va. 711, 14 S. E. 163; City of Cincinnati v. Stone, 5 Ohio St. 38; Hilsdorf v. City of St. Louis, 45 Mo. 94, 100 Am. Dec. 352. It is believed, however, that an examination of the recent American cases dealing with the subject will disclose a decided tendency upon the part of the courts to circumscribe the area within which the general rule is to operate, and to apply the principle that, where the contractee is subject to an absolute duty to do or not to do certain things with reference to the work and the prem-

ises, such duty is nondelegable to the contractor, so as to relieve the contractee of liability for injuries caused by its nonfulfillment. Perhaps no particular case can be cited which states all of the qualifications to the general rule herein observed, but a number of cases recognizing exceptions from which the general statement may be derived can be found. See Salliotte v. King Bridge Co., 6 Cir., 122 F. 378, 58 C. C. A. 466, 65 L. R. A. 620; Thomas v. Harrington, 72 N. H. 45 A. 285, 65 L. R. A. 742; Jacobs v. Fuller & Hutsinpiller Co., 67 Ohio St. 70, 65 N. E. 617, 65 L. R. A. 833; [City of] Anderson v. Flemming, 160 Ind. 597, 67 N. E. 443, 66 L. R. A. 119; Louisville & N. R. Co. v. Tow, 63 S. W. 27, 23 Ky. Law Rep. 408, 66 L. R. A. 941, and the very full and exhaustive notes to each of the cases. These notes, together with the comments of the author, furnish a clue to the cases which clearly establish the exceptions to the rule stated."

One of the exceptions is stated thus. Where the location and condition of the property and the nature of the work to be done are such that in the natural course of things mischievous consequences must be expected to arise, unless means are adopted by which such consequences may be prevented, then the owner is under the nondelegable duty to see that appropriate preventative measures are adopted.

Bower v. Peate, L. R. 1 Q. B. Div. 321, 35 L. T. N. S. 321; Norwalk Gaslight Co. v. Borough of Norwalk, 63 Conn. 495, 28 A. 32; Note 23 A. L. R. 1017 et seq.

As pointed out by Judge Anderson in the unreported opinion in

L. Pacini v. Southwestern University[1] (1-21-38), the rule of Bower v. Peate, supra, is one requiring ordinary

---

[1]No opinion for publication.

care under the circumstances, which may be a high degree of care actually, but is not a rule of absolute liability regardless of the exercise of ordinary care, so to make the owner an insurer as in Rylands v. Fletcher, (1868) L. R. 3 H. L. 330, discussed in 66 L. R. A. 147, which has reference to situations where the owner brings upon his premises some substance, wild and vicious animal, or the like which may escape and injure person or property despite all precautions. There the owner keeps the thing at his peril and becomes an insurer. See 76 A. L. R. 1257 for reference to later notes.

More specifically the facts before us are that International was having its property improved by several contractors who were not in privity with one another. It had assumed the obligation of providing water for itself and the contractors and had through the City of Memphis Electric Power Division installed a temporary line for the well which ran within about 50 feet of the southwest corner of building No. 4 as planned but not yet built.

To facilitate its over-all purpose it deemed it desirable, if not necessary, to make available for itself and others a temporary supply of electric power. Accordingly, it contracted with Virginia to supply that power but did not specify where the lines were to be located and took no part in locating them.

After the foundation for building No. 4 had been laid as planned by International but before the steel work was begun, Virginia had the power company hook on to the temporary line near the well without consulting International and the temporary line was run angling by and within 56 inches of what later became the upper southwest corner of building No. 4 where the accident later occurred.

International's contention is that it had nothing to do with the placing of the temporary line and that it cannot be held for the negligent manner of its location. That it was due to the negligence of Virginia alone and that it is not liable to Virginia's servant for the negligence of the master—the general rule—whose negligence was "collateral" or "casual", that is, that it was not necessary for Virginia to locate the line here and that the location was a mere detail of the work, which was not contemplated by the contract with International. Smith v. Bank of Commerce & Trust Co., supra.

We are unable to harbour so light a view of the matter.

International had had a high power line installed and would have ample reason to expect Virginia to use the same facility and strength of current for a large number of consumers on the premises. The line was not put in for the use of Virginia alone but at the instance of International and for its benefit along with others it might employ.

■ It thus became a supplier of electricity and we see no reason why it should not owe the same duty to the public properly upon the premises to exercise due care such as repeatedly has been held as to power companies.

■ ■ Electricity, if not properly safeguarded, is one of the most dangerous and lethal agencies known to man.

Tennessee Electric Power Co v. Sims, 21 Tenn. App. 233, 108 S. W. (2d) 801.

". . . One who deals with an article which is imminently dangerous owes a public duty to all to whom it may come and who may be endangered thereby to exercise caution adequate to the peril involved, as for example, in giving notice of its dangerous character, and

there need be no privity between him and the person injured . . ." 45 C. J. 846, Section 264.

"It is by no means necessary that the duty, violation of which may constitute actionable negligence, should arise out of contract but it may be a legal duty which may arise in various ways. It may be prescribed by statute or ordinance, a common law duty imposed by implication of law. The duty may arise from the relation or situation of the parties. It may arise from the circumstances surrounding or attending an occurrence or transaction, as where one is using or dealing with a highly dangerous thing which, unless managed with the greatest care is liable to cause injury to bystanders or others. . .". 45 C. J. 643, Section 18.

With reference to electric companies it is said in 20 C. J. 345, Section 39, 29 C. J. S., Electricity, Section 42: "Location of Wires and Appliances. The duty of exercising due care extends to every place where persons have a right to be, whether for business, convenience or pleasure, and extends to those upon the premises of consumers, and it makes no difference that the injury occurred on private property, and not in a public highway, if the person or animal injured had a right to be on such private property. The mere fact that there may be no contractual relationship between the parties does not change this principle. . . .". See City of Lawrenceburg v. Dyer, Adm'r., 11 Tenn. App. 493.

In McHarge v. M. M. Newcomer & Co., 117 Tenn. 604, 100 S. W. 700, 702, 9 L. R. A., N. S., 298, some of the exceptions to the general rule of non-liability are listed as: ". . . where the thing to be done or the manner of its execution involves a duty to the public incumbent upon the proprietor or employer; when the

work contracted for is intrinsically dangerous, and the performance of the contract will probably result in injury to third persons or the public; . . . ."

The duty here to use due care is non-delegable.

▆▆ It does not seem important to decide whether Sartain was strictly an invitee because he was properly on the premises and a duty was owed to him not to expose him to inherently dangerous agencies, but under our cases we think he was an invitee by necessarily implied invitation. Railroad v. Hensley, 7 Tenn. Civ. App., 610, Chamberlain v. Lee, 148 Tenn. 637, 257 S. W. 415; Ellis v. Cotton Oil Co., 3 Tenn. Civ. App. 642. Garis Eberling, 18 Tenn. App. 1, 11-17, 71 S. W. (2d) 215.

▆▆ Our conclusion is that the case was properly submitted to the jury, in this respect, as to International.

International's Assignment III complains of the charge of the Court which was as follows: " 'Ordinarily the owner of the premises upon which such owner employs independent contractors to perform work owes no duty of care to the employees of such contractors or their subcontractors, but the law also is that if the location and condition of the property and the nature of the work to be done are such as that in the general course of things mischievous consequences must be expected to arise, unless means are adopted by which such consequences may be prevented, then the owner is under the non-delegable duty to see that appropriate preventative measures are adopted; and in this cause, if you find that the International Harvester Company had knowledge of the creation on its premises of a situation by a contractor from which in the natural course of things, mischievous consequences must be expected to arise, unless means were adopted by which such consequences might be prevented; then the defendant International

Harvester Company was under the non-delegable duty to see that preventative measures were adopted.' "

It is argued that this made International an insurer of the safety of the premises and was equivalent to a directed verdict against it.

We do not think it does.

This language is in substance that of 27 Am. Jur., 515, Section 38, citing Smith v. Bank of Commerce & Trust Co., supra, and McHarge v. M. M. Newcomer & Co., supra.

It is also in line with what we have heretofore said.

Furthermore, just preceding this part of the charge the Court charged that no defendant was the agent or employee of any other defendant and the negligence of one was not imputable to the other; following the questioned part, the Court charged: "Negligence generally means the failure to use reasonable and ordinary care under the circumstances. It may be an act of omission, or it may be an act of commission. It may be a failure to do something that should have been done under the circumstances, or it may be the doing of something that should not have been done under the circumstances; what might be an act of negligence in one set of circumstances might not be an act of negligence under other circumstances. . . .".

We do not know how this charge could be added to for clarity, unless the Court had been requested to state specifically that International was not an insurer of the safety of the premises. No such request was tendered and the law as charged was correctly given.

Also, as we understand the law, it was the duty of International to take preventative measures before it had actual knowledge of the dangerous condition, if under the circumstances it should have anticipated injurious

consequences must arise in the absence of preventative measures.

We, therefore, overrule this assignment.

Part of International's Assignments I, IV, XXI and XXIII and Virginia's I, and III is that there was no evidence of any negligence, and that the jury was allowed to speculate on how the accident occurred.

It is said that because no one saw the rod come in contact with the wires that the jury could only speculate as to the cause.

Sartain remembers nothing from a time beginning prior to the accident. Taylor is dead and others were attracted by the flash or the noise and saw Sartain fall.

Several possibilities are suggested as to the cause.

▮ The rule that a jury may not speculate between two equally probable causes, for only one of which defendant is responsible, has no application where there is no substantial evidence of a sufficient cause or causes other than the negligence charged. Gannon v. Crichlow, 13 Tenn. App. 281. Nashville Ry. & Light Co. v. Harrison, 5 Tenn. App. 22. Woodman v. Metropolitan R. Co., 149 Mass. 335, 21 N. E. 482, 4 L. R. A. 213, 14 Am. St. Rep. 427.

In the last case the decedent "was seen to fall, and was picked up senseless at a point where some rails projected beyond a temporary barrier inclosing a place where defendant was having a track laid. There was no evidence of any other possible cause of the fall. This warranted a finding that he tripped over the end of the rails."

▮ We think the jury was warranted in finding that the injury was due to the overhanging end of the rod coming into contact with the wires by accident, judging from the manner in which they had been handled

previous to the accident and the positions of the workmen and direction Sartain was facing.

There was no evidence that it happened any other way.

■ A case may be made out by direct or circumstantial evidence, or by both.

■ If the evidence for plaintiff with all reasonable inferences therefrom, made his theory more probable than any other, this takes the case to the jury and will support a verdict. Everett v. Evans, Tenn. App., 207 S. W. (2d) 350, page 352.

We overrule these assignments.

We overrule assignments VI, VII, IX, X, XI, XXI, XXII and XXIII for the reasons heretofore stated under previous assignments.

Assignment XII is overruled because, according to what we have just said, it is not a correct statement of law; the danger need not have been "known" to International but only such as should have been "anticipated."

Assignment XIII is overruled because it unduly emphasizes International's theory that the wire could be seen easily under all circumstances and that it was a dangerous wire, but fails to include plaintiff's theory that he did not see it and that in some situations it was not easily visible.

We think the general charge fully covered contributory negligence.

Assignment XIV is overruled because it is not a correct statement of law.

The special request refused asked the Court to charge the jury that "the proof of the plaintiff of his present earning capacity and of his life expectancy, while they may be considered by you, are not evidence as to the amount which the plaintiff is entitled to recover", etc.

■ It is evidence, although not conclusive evidence, and the Court so charged the jury.

Assignments VIII and XV are overruled because both attempt to, but fail to state correctly the law as to independent, intervening and efficient cause.

■ The essence of the rule is whether the subsequent successive acts and injurious results were probable and therefore to be anticipated. Garis v. Eberling, 18 Tenn. App. 1, 71 S. W. (2d) 215; Gannon v. Crichlow, 13 Tenn. App. 281; Ford Motor Co. v. Wagoner, 183 Tenn. 392, 192 S. W. (2d) 840, 852, 164 A. L. R. 364.

For a learned discussion of what is meant by probable or reasonably foreseeable, see opinion of Judge Felts, Spivey v. St. Thomas Hospital, Tenn. App., 211 S. W. (2d) 450.

(A delirious patient left unguarded jumped out of an upper window).

■ Assignment XVI complains that the Court allowed plaintiff to read the deposition of his witness, Schlobohm, whose deposition had been taken under Code Sec. 9806 (4) (Witness under necessity of leaving state before cause is at issue, or before trial), because the witness was present at the trial, having been brought in by defendants.

■ Assignment XVII complains that the Court allowed defendant, Virginia, to read the deposition of plaintiff's witness, Stevenson, whose deposition had been taken under Section 9806 (1) (unable to attend because of physical condition) but not read by plaintiff, who had elected to examine him orally.

There was no error in either action. Sherrod & Co. v. Hughes, 110 Tenn. 311, 75 S. W. 717.

■ As to witnesses, in or out of the county, whose depositions have been taken by either party, and the op-

posite party has brought the witness into court by subpoena, the party who has taken the deposition may read it, or may examine the witness orally, or decline to do either; but in either event, the opposite party may examine the witness as the witness of the party who took the deposition, as to all matters whether embraced in the deposition or not. Also, Brandon v. Mullenix, 58 Tenn. 446.

Both assignments are overruled.

Assignment XVIII complains of the proof through witness Michael of plaintiff's life expectancy followed by a mathematical calculation made by multiplying the expectancy by plaintiff's periodic earnings at the date of injury.

Mortality tables are competent evidence ·where disability is permanent. Mississippi & Tennessee Railroad Company v. Ayres, 84 Tenn. 725, Louisville & N. Railroad Co. v. Hunter, 4 Tenn. Civ. App. 465.

Any one could have made the calculation.

This assignment is overruled.

Assignment XIX complains of certain evidence adduced through Schlobohm and Stevenson consisting of exhibits of letters, plats, contracts, etc. some of which relate to temporary installations of power lines made prior to the one causing the injury. It is said this was confusing to the jury and prejudicial. It may have been confusing but it was not prejudicial, if the jury understood that the line causing the damage was installed at the direction of Virginia.

We think they understood, as is partly indicated by the form of verdict they first attempted to bring in assessing greater damages against Virginia than against International.

462

We overrule this assignment.

Assignment XX complains of evidence showing that Virginia at the suggestion of International had the line relocated about four months after the accident to a safer position.

This evidence was let in not as substantive evidence of the negligence charged in the declaration, but as evidence of who had control of the line at the time of the accident. The Court so instructed the jury at the time and in the general charge. (R. 901 bot.)

But it is said that this subsequent act is not evidence of control four months earlier, in that after the accident had occurred, "knowledge of the parties and conditions of the work were or may have been entirely different in that new facts and circumstances guided or controlled the action of the parties and the making of the changes in the line."

This seems to us to be rather an argument against its admissibility as evidence of negligence. So far as actual knowledge goes we have heretofore said that it is not knowledge alone but also reasonable expectation of damage to follow.

Our view is that if admissible for any purpose it is properly let in, although its scope should be confined by the Court to the point to which it is applicable.

We overrule this assignment.

Assignments XXIV and XXV complain of the failure of the Court to grant a new trial respectively because of excessiveness and of such excessiveness as to indicate passion, prejudice or unaccountable caprice.

Virginia, by its assignment IV, is in substance the same as International's XXV.

Since there was a remittitur of $20,000 as heretofore stated, plaintiff has appealed seeking a restoration of the original amount of $60,000.

On account of the following occurrence when the jury first reported, International particularly complains that the final verdict was larger against it than the jury first sought to assess. This is covered by its XXVI and will be briefly disposed of.

The jury first reported $20,000 against International and $40,000 against Virginia. The Court further instructed them that they could assess only one and the same amount against such number of defendants as they found to be guilty of negligence, as to which he had already instructed them.

The jury retired and reported back $60,000 against both of these defendants and not guilty as to the power company.

Thus, it seems clear that they fixed the plaintiff's damage at $60,000.

There was no error charged in the action of the Court in this respect.

But it is said by International that by their first verdict the jury found International guilty only of remote negligence, which would not support a verdict.

We cannot agree with this inference, but think rather that the jury felt that International was not guilty of as much negligence as was Virginia, under whose direct supervision the line was located and maintained. The average juror would hardly penalize so heavily remote negligence.

We think it no more than what juries have frequently tried to do but which the law does not permit. Railroad v. Jones, 100 Tenn. 512, 45 S. W. 681.

We, therefore, overrule International's Assignment XXVI.

Now as to the assignments of both plaintiff and defendants.

It is not disputed that plaintiff was very painfully and seriously injured both by the fall of about 28 feet to the pavement and by electric shock and burn. It appears also that he will not be able to work on elevated places which had been part of his usual occupation, but it is not definite that he will not be able to follow some part of his usual occupation on the ground level or other occupation.

He suffered thirteen bodily burns; the neck down to his elbow, thigh, left leg, foot and thigh, right heel and leg, palm of right hand, one finger burned off completely and left hand mutilated; brain concussion and skull fracture, fracture of brain membrane, partial deafness and partial loss of equilibrium. He was unconscious for about two months but he has suffered great pain. His medical expenses were $5,560.90. He was 28 years old, a top grade steel worker, earning $100 per week. At the time of the trial he was still unable to work but could run a lawn mower and had driven an automobile to St. Louis with his family. His over-all permanent disability is 30 to 35%; his neurological disability is 25%. His expectancy was 39.49 years and if he should be unable to follow any gainful employment the rest of his life his loss of earnings would be $205,000 based on present earnings, and with 35% disability his loss figures $75,000.00 approximately.

If, on the other hand, he had not lived his expectancy, or had become wholly disabled by disease, or suffered periods of unemployment, etc., who knows the result?

We are again confronted with the delicate question of whether we should revise the verdict of a jury, and in this case either to restore it to the original amount before the remittitur or to reduce it farther.

The latest case from our Supreme Court is Waller v. Skelton, 186 Tenn. 433, 211 S. W. (2d) 445.

At first blush that case may appear to hold that there must be direct, positive evidence in the record of corruptness, passion, or unaccountable caprice. We do not so construe it, but think the language of the next to the last paragraph of the opinion and the action of the Court of Appeals was related only to the peculiar facts of that case.

The power of both trial and appellate courts is discussed and upheld both where the verdict is merely excessive and where it is so excessive as to indicate passion, prejudice, etc., in Grant v. Louisville & N. Railroad Co., 129 Tenn. 398, 165 S. W. 963.

It serves no useful purpose to refer to what was there said except what is applicable here.

 On page 409 of 129 Tenn., on page 965 of 165 S. W. the Court said:

"In the present case, the trial judge found that the verdict was so excessive as to indicate passion, prejudice, or caprice, so that, even according to the view of the law taken by Mrs. Grant's counsel, the court was authorized to suggest a remittitur. It is said, however, that there was nothing to indicate passion, prejudice, or caprice on the part of the jury, that it was a body of fair-minded men, subject to no improper influence, etc.

"The deliberations of a jury are in secret, and no one can ordinarily know what considerations move them. The only evidence the court usually has of passion, prejudice or caprice is the amount of the verdict. He is

authorized to infer the existence of such improper influence from an excessive verdict alone. In this case, the trial judge, who saw the plaintiff and heard her injuries described, said that the verdict was so large as to indicate passion, prejudice, and caprice.'' Reeves v. Catignani, 157 Tenn. 173, 7 S. W. (2d) 38.

So far as we know, this is the law today and we believe the the Supreme Court would have referred to that case in the first one cited above, if any change had been intended to be made.

 Numerous subsequent cases have held that where it does not appear that the trial judge abused his discretion, his action in suggesting a remittitur will not be disturbed.

We think in view of the evidence that it cannot be said that the verdict was excessive to some extent at least.

The estimate of $75,000 as his damage is taken from plaintiff's brief; it gives him the benefit of the doubt about every future uncertain element except perhaps his ability to follow any gainful occupation at all.

 We think the trial judge exercised a sensible, excellent discretion in the reduction made, with respect to both plaintiff and defendants.

By way of comparison see Rice-Stix Dry Goods Co. v. Self, 1935, 20 Tenn. App. 498, 101 S. W. (2d) 132, where disability was total and permanent as to earning capacity and the amount was $40,000 before the era of the shrunken dollar.

For contrast see Garis v. Eberling, 18 Tenn. App. 1, 71 S. W. (2d) 215.

We, therefore, overrule the assignments of all parties on this question.

This disposes of all assignments of the plaintiff and of International.

The remaining assignments of Virginia follow.

Assignments V to VIII complain of the failure of the Court to charge that plaintiff was charged with knowledge of the presence of the wires because, it is said, he testified that he could have seen them; and if he knew of the presence of the wires any time before the accident, he would be chargeable with such knowledge at the time of the accident.

What plaintiff said was that he had been working on other buildings in that area and next to No. 4 and the proof is that when he began to work on No. 4, he was at the east or opposite end from where the wires went at angle near the fatal corner.

"Q. And you worked all the time in this area; now, you say you don't remember and have no recollection of anything about the line there at all. A. No I didn't see it; I could have seen it. There is nothing outstanding about it that ever brought it to my attention.

"Q. And you don't remember having seen it at any time, have any recollection of it? A. No, sir; we aren't out there sightseeing when we are working.

"Q. No, that is correct, but you were right there in the neighborhood; did you notice them when they were constructing that line while you were working on No. 2? A. I did not notice it.

"Q. And you didn't notice it when they were putting it up about the time you were there? A. I did not.

"Q. And all the time you were working, you didn't notice this power line at all? A. No; I had a job to do, and I was working on the raising gang, and it was a pretty hot one, and we weren't up there looking around at the sights there.

"Q. You never paid any attention to anything around you but only at the work and not outside, just the thing

that was right in front of your nose, is that the way you work? A. That is right.''

It will be observed that he was being asked about the wires in the general neighborhood, but he did not testify that he could have seen the wires from where he was standing when injured looking down. His employer's work did not require and had no connection with the wires and nobody ever warned him of their presence near the corner of No. 4.

For a somewhat similar situation see as to knowledge Null v. Electric Power Board, Tenn. App., 210 S. W. (2d) 490, 492, 494, 496, where it is said: ''. . . The most that could be inferred was that they could have seen it if their attention had been called to it. Their work was above and some distance away from this ground connection and did not necessarily direct their attention to the defect.''

We think this was for the jury in this case and they were amply instructed as to due care by Sartain for his own safety.

We overrule these assignments.

For like reasons we overrule Assignment XIV.

Assignments IX, X, XI, XII, XIII, XIX, XX, XXI, XXII, XXIII, and XXIV have already been discussed under International's assignments and overruled.

Assignment XV is overruled. The Court properly submitted to the jury the issue whether defendants should have insulated the wires near the building.

The last assignment undisposed of is XVII, complaining testimony of Dr. Sparr, who examined him but did not treat him.

This is based on the distinction drawn in Gulf Refining Co., v. Frazier, 15 Tenn. App. 662 between ob-

jective symptoms, which are those visible from an examination of the patient, and subjective symptoms, which are those stated to the doctor by the patient; the latter are not admissible, unless made to an attending physician while the patient is seeking relief and under no temptation to malinger.

The trial court very accurately applied the distinction here by allowing the doctor to testify to obvious scars and wounds, but not as to the equilibrium test.

Nor do we find any error as to the hypothetical question and answer. Defendant objected on the ground that it did not contain all the facts. The Court gave counsel the opportunity to supply additional facts, but he did not do so.

Dr. Sparr then expressed his opinion on the facts as given that Sartain was not then and probably would not be able to work on elevated structures the rest of his life.

Therefore, a judgment will be entered here for $40,000 against both plaintiffs-in-error with interest from December 1, 1947, and costs.

Adams, Sp. J., and Baptist, P. J., concur.